FILED
United States Court of Appeals
Tenth Circuit

September 17, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

WILLIAM S. FLETCHER,
individually, and as member of the
Osage Development Council, and on
behalf of himself and all others
similarly situated; CHARLES A.
PRATT, individually, and as member
of the Osage Development Council,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF THE INTERIOR;
BUREAU OF INDIAN AFFAIRS;
SALLY JEWELL, in her official
capacity as Secretary of the Interior;
KEVIN K. WASHBURN, in his
official capacity as Assistant Secretary
of the Interior-Indian Affairs,[*]

      Defendants-Appellees,

and

SHRINERS HOSPITALS FOR
CHILDREN,

      Defendant.

No. 12-5078

---

[*] Pursuant to Fed. R. App. 43(c)(2) Kenneth Salazar is replaced by Sally
Jewell as Secretary of the U.S. Department of the Interior. Larry Echo Hawk is
replaced by Kevin K. Washburn as the Assistant Secretary of the Interior-Indian
Affairs.

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:02-CV-00427-GKF-PJC)**

Jason B. Aamodt of the Aamodt Law Firm, Tulsa, Oklahoma (G. Steven Stidham, Tulsa, Oklahoma; Krystina E. Hollarn and Dallas L.D. Strimple of the Aamodt Law Firm, Tulsa, Oklahoma; and Amanda S. Proctor of the Shield Law Group PLC, Tulsa, Oklahoma, with him on the briefs), for Plaintiffs-Appellants.

Katherine W. Hazard, Attorney, United Sates Department of Justice, Environment and Natural Resources Division, Washington, D.C. (Alan Woodcock, Office of the Solicitor, United States Department of the Interior, Tulsa, Oklahoma; Ignacia S. Moreno, Assistant Attorney General, and Joseph H. Kim and John L. Smeltzer, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., with her on the brief), for Defendants-Appellees.

Before **TYMKOVICH**, **ANDERSON**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

After settlers displaced the Osage Nation from its native lands, the federal government shunted the tribe onto the open prairie in Indian Territory, part of what later became the State of Oklahoma. At the time, the government had no idea those grasslands were to prove a great deal more fertile than they appeared. Only years later did the Osages' mammoth reserves of oil and gas make themselves known. When that happened, the federal government appropriated for itself the role of trustee, overseeing the collection of royalty income and its distribution to tribal members. That role continues to this day. In this lawsuit,

tribal members seek an accounting to determine whether the federal government has fulfilled the fiduciary obligations it chose to assume. The district court dismissed the tribal members' claims. We reverse.

The statutory story begins in 1906. It was then Congress devised a scheme to deal with the Osages' newfound wealth. *See* Act of June 28, 1906, Pub. L. No. 59-321, 34 Stat. 539. Congress severed the mineral estate underlying Osage lands from the surface estate, placed the mineral estate in trust, directed the Secretary of Interior to collect royalties, and told the Secretary to distribute the royalties (along with interest income) every quarter on a pro rata basis to individual members of the tribe. *Id.* § 4, 34 Stat. at 544. To determine who qualified as a tribal member entitled to receive an interest in the mineral estate, Congress provided for the creation of an official tribal roll. *Id.* § 1, 34 Stat. at 539-40. This same statutory structure remains intact and in force today, though with some amendment. As time passed, various tribal members sold — and others gave away or bequeathed — their royalty interests (sometimes called "headrights") or portions of them (a process that resulted in "fractionalization"). Sometimes these assignments went to other tribal members; other times they went to non-tribal members. Displeased with the choice by some headright owners to convey their interests to non-tribal members, Congress responded with a series of legislative amendments placing ever increasing limits on the practice. *See* Felix S. Cohen,

*Cohen's Handbook of Federal Indian Law* § 4.07, at 304-08 (Nell Jessup Newton ed., 2012).

This litigation's story begins in 2002. It was then William Fletcher and Charles Pratt, two Osage tribal members who receive payments under the 1906 Act, charged the federal government with breaching its trust responsibilities. A decade-long blizzard of paper followed — no fewer than seven motions to dismiss, three amended complaints, a first appeal and now this second. Yet even still the case remains stunted at the motion to dismiss stage, never having managed to progress past the pleadings to the facts.

All those years and all that paper have whittled this case down so much that in this appeal we are asked to resolve only a single legal question: Do Osage tribal member headright holders possess the legal right to seek an accounting from the Secretary of the Interior? No one disputes that the plaintiffs' allegations are sufficient to invoke an accounting, only whether they have the right to demand one. The district court ruled no such right could be found in positive law, granted the government's (latest) motion to dismiss, and entered a final judgment.

We find ourselves unable to agree.

The district court was surely right in its general approach to the question. The government's relationship with and duties to Native American tribes are generally defined in the first instance by "applicable statutes and regulations."

*United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2325 (2011). One might be excused for thinking the relationship between the federal government and Native American tribes resembles a traditional trust relationship bearing all the usual attendant fiduciary responsibilities — responsibilities the government seems to have taken up voluntarily and assumed for itself. But traditional trust principles cannot displace what statutes and regulations mandate. Traditional trust principles may help illuminate the meaning of a "specific, applicable, trust-creating statute or regulation." *Id.* Indeed, we normally assume Congress has legislated against the background of traditional "adjudicatory principles" — including traditional adjudicatory principles found in trust law. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). But those background principles cannot be used to "override" the language of statutes and regulations "defin[ing] the Government's . . . obligation[s]" to a tribe or tribal members. *Jicarilla Apache Nation*, 131 S. Ct. at 2329-30. Congress enjoys considerable latitude in deciding how to organize and manage Native American trusts and it is permitted to "structure the trust relationship to pursue its own policy goals" — sometimes by establishing a full blown trust relationship with all the attendant fiduciary duties we're familiar with from the common law and equity, but sometimes also by "establish[ing] only a limited trust relationship to serve a narrow[er] purpose." *Id.* at 2324-25. So, as the district court quite rightly observed, to trigger a duty to account the plaintiffs in this case first had to

-5-

identify some statute or regulation creating a trust relationship between them and the government.

The district court also correctly held that just such a statute exists. The 1906 Act clearly creates a trust relationship — and not just a trust relationship between the federal government and the Osage Nation, but also between the federal government and the individual Osage headright owners who are plaintiffs in this case. Though the language of the Act is both arcane and antiquated, after laboring through it there's no question about this much. The Act requires the government to collect royalties, place them "to the credit of" each individual headright owner, and then disburse them to each individual headright owner on a quarterly basis, with interest. *See* 1906 Act § 4(1)-(2), 34 Stat. at 544. A small slice of royalty income may be diverted to tribal operations, *id.* § 4(3), (4), but all else is "placed . . . to the credit" of headright owners and distributed to them personally. In short, the 1906 Act imposes an obligation on the federal government to distribute funds to individual headright owners in a timely (quarterly) and proper (pro rata, with interest) manner. Over the years both Congress and this court have repeatedly recognized that, in this way, the 1906 Act created a trust relationship between the government and individual headright owners.[1]

---

[1] *See, e.g.*, 1906 Act § 4(2), 34 Stat. at 544 (mandating that royalty

(continued...)

-6-

On appeal the federal government contests none of this.

The only remaining question, then, is whether, attendant to the — undisputed — trust relationship between government and individual tribal members, the government must provide an accounting when asked. Everyone acknowledges the government has many other duties as a result of its trust relationship, like "supplying account holders with periodic statements of their account performance." *See* 25 U.S.C. § 162a(d)(5). But does the government have a duty to provide an accounting?

The answer comes clear in 25 U.S.C. § 4011:

(a)     Requirement to account

The Secretary [of the Interior] shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title.

By its plain language this provision appears to impose on the federal government a duty to "account for" — to render a reckoning, answer for, explain

---

[1](...continued)
payments be made the same way as "*other moneys held in trust*" (emphasis added)); Act of Apr. 18, 1912, Pub. L. No. 62-125, § 5, 37 Stat. 86, 87 (referring to Osage funds in the U.S. Treasury as "individual trust funds"); Act of Mar. 3, 1921, Pub. L. No. 66-360, § 4, 41 Stat. 1249, 1250 (also describing such funds as "trust funds"); *Globe Indem. Co. v. Bruce*, 81 F.2d 143, 150 (10th Cir. 1935) ("[T]he United States took the legal title to [Osage] funds and moneys in trust, but . . . the beneficial title to the funds and moneys vested in the individual members of the tribe."); *Chouteau v. Comm'r*, 38 F.2d 976, 978 (10th Cir. 1930) ("The mineral reserves under the lands are held in trust by the United States for the tribe and its members . . . .").

or justify, *see* 1 *The Oxford English Dictionary* 85 (2d ed. 1989) — the daily and annual balances of money it holds in trust. Of course, the government must account, answer or explain itself to *someone*, and the plain language of the statute seems to tell us who: to the tribe when the funds are held "for [its] benefit," and to individual tribal members when the funds are held "for [their] benefit." As we've seen, the trust funds at issue in this case — collected and disbursed under the terms of the 1906 Act — are being held for the benefit of individual members of the Osage Nation. So it would seem that — in our case at least — Congress has chosen to afford individual tribal members the statutory right to seek and obtain an accounting, just as plaintiffs contend.

Other evidence tends to confirm this understanding. Take the surrounding statutory structure and its history. At the same time it enacted § 4011(a), Congress created the Office of Special Trustee for American Indians and tasked it with providing Native American account holders with fair and accurate information about their accounts. *See* American Indian Trust Fund Management Reform Act of 1994, Pub. L. No. 103-412, §§ 301, 303(b)(2)(A), 108 Stat. 4239, 4244, 4245 (codified at 25 U.S.C. §§ 4041, 4043(b)(2)(A)). Congress also simultaneously ordered the Secretary of the Interior to file with Congress a "report identifying for each tribal trust fund account . . . a balance reconciled as of September 30, 1995." *Id.* § 304, 108 Stat. at 4248 (codified at 25 U.S.C. § 4044). And Congress instructed the Secretary to institute "adequate controls

over receipts and disbursements" and to supply trust fund beneficiaries with "periodic statements." *Id.* § 101, 108 Stat. at 4240 (codified at 25 U.S.C. § 162a(d)(2), (5)). The existence of these provisions tends to undercut any suggestion that § 4011(a) fails to invest individual tribal members with an enforceable right to an accounting. To read the statute as merely providing administrative direction to the government would appear to leave it without any independent work to do — a nullity — covering only the same ground already covered by other contemporaneously enacted statutory provisions. To read it as merely guaranteeing periodic reports to beneficiaries would invite the same result. And we are always reluctant to assume a statute is so worthless that Congress was up to — literally — nothing when it bothered to labor through the grueling process of bicameralism and presentment. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

More evidence still points in the direction of an accounting right. While the Supreme Court has said we may not employ traditional trust principles inconsistent with Congress's statutory directions, the Court has *also* said we *may* refer to traditional trust principles when those principles are consistent with the statute and help illuminate its meaning. *Jicarilla Apache Nation*, 131 S. Ct. at 2325. In the statute before us, Congress has chosen to invoke the concept of an accounting. That concept has a long known and particular meaning in background trust law. It means that "a beneficiary may initiate a proceeding to

-9-

have the trustee's account reviewed and settled by the court." Alan Newman et al., *The Law of Trusts and Trustees* § 966 (3d ed. 2010). Indeed, "[t]he beneficiary of a trust can maintain a suit to compel the trustee to perform his duties as trustee," including his duty to account. *See* Restatement (Second) of Trusts § 199 cmt. a; *see also id.* § 172. So when Congress says the government may be called to account, we have some reason to think it means to allow the relevant Native American beneficiaries to sue for an accounting, just as traditional trust beneficiaries are permitted to do.

Any residual doubt about § 4011(a)'s meaning falls away in the face of a few further considerations. First, the government itself doesn't dispute that § 4011(a) grants an accounting right, at least to Native American tribes like the Osage Nation. Second, while we are always cautious about assuming a statute grants a privately enforceable right, within the narrow field of Native American trust relations statutory ambiguities must be "resolved in favor of the Indians." *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *cf. Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1984) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians."). Even more specifically, the Supreme Court has held that when it comes to statutes involving Native Americans, they "need not explicitly provide" a private right of action. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009). All that's required for a private right of action to exist is a showing

-10-

the statute at hand "can fairly be interpreted" to permit it.  *Id.*  No one in this case

has tried to suggest § 4011(a) isn't "fairly interpreted" as granting individual

tribal members a right to compel an accounting.  To the contrary, and finally, at

least one other circuit has already read § 4011(a) as requiring the government to

provide tribal members with an accounting when asked.  *See Cobell v. Salazar*,

573 F.3d 808, 813 (D.C. Cir. 2009).[2]

For its part, the district court accepted that § 4011(a) affords individual

Osage tribal members the right to compel an accounting from the government.  It

held only — and very differently — that the accounting granted by § 4011(a)

would do the plaintiffs no good.  The district court began by pointing to the fact

§ 4011(a) limits the government's accounting responsibilities to funds "which are

deposited or invested pursuant to section 162a of this title."  Turning to that

provision, the district court noted that it authorizes the Secretary of Interior to

deposit Osage trust funds in banks.  *See* 25 U.S.C. § 162a(a).  Because § 162a(a)

speaks only of deposits, the district court reasoned that the government's

---

[2]  Of course, to sue the government a waiver of sovereign immunity must also be found somewhere in the federal code.  But when the parties last visited this court, we held that 5 U.S.C. § 702 provides the necessary waiver of sovereign immunity for the plaintiffs' breach-of-trust claims and no one before us disputes that the same holds true for their accounting claim.  *See Fletcher v. United States*, 160 F. App'x 792, 797 (10th Cir. 2005); *see also Cobell v. Norton*, 240 F.3d 1081, 1094 (D.C. Cir. 2001) ("Insofar as the plaintiffs seek specific injunctive and declaratory relief — and, in particular, seek the accounting to which they are entitled — the government has waived its sovereign immunity under this provision [§ 702].").

fiduciary duties are limited to the act of *depositing* money. With this understanding of § 162a(a) in hand, the district court flipped back to § 4011(a) and implied a parallel limitation into the accounting duty it imposes — holding that the government's duty to account is limited to accounting for the trust fund deposits it makes, not the withdrawals it effects. All this matters, the district court held, because the plaintiffs' primary concern seems to be that the government may have mishandled trust fund distributions, not deposits, by sending money to individuals who are not tribal members and who are not entitled to share in the Osage trust fund under the various amendments Congress has adopted since the 1906 Act.

This is where things went awry. The district court misread § 162a(a). Nothing in that provision purports to limit the Secretary's fiduciary obligations to the Osages, let alone circumscribe the accounting promised by § 4011(a). Section 162a(a) is simply and all about granting the Secretary of the Interior authority to invest monies belonging to Native American trust fund beneficiaries. It says the Secretary generally may deposit trust funds in bank accounts or invest them in public debt obligations. The specific language on which the district court relied merely qualifies this general rule. When it comes to Osages "the foregoing" investment options afforded the Secretary apply "only with respect to the deposit of such funds in banks." Awkwardly stated perhaps, but the meaning is plain: while the Secretary generally may deposit Native American trust funds in banks

-12-

*or* invest them in United States debt securities, when it comes specifically to the Osages *only* a bank deposit is authorized. No doubt the Secretary must keep Osage money so liquid because under the terms of the 1906 Act the funds must be disbursed pro rata every quarter. *See White Mountain Apache Tribe of Ariz. v. United States*, 20 Cl. Ct. 371, 379 (1990) (explaining that "Congress directed that the [Osage] accounts be accessible" so that "it was possible to credit each member of the tribe a pro rata share").

Statutory structure and history again confirm our understanding. Subsections (a) through (c) of § 162a all speak to the various investment options available to the Secretary with respect to various tribal funds. *See* Cohen, *supra*, § 5.03, at 400-01. These provisions were enacted between 1918 and 1990 as Congress sought to refine and qualify the Secretary's options.[3] Only when we come to § 162a(d) are traditional trust responsibilities expressly discussed and delineated. And Congress enacted § 162a(d) at the same time and in the same act it imposed the accounting trust obligation found in § 4011(a), many years after it adopted § 162a(a)-(c). *See* American Indian Trust Fund Management Reform Act § 101, 108 Stat. at 4240. All these clues point to the conclusion that § 162a(a) through (c) are of a piece and speak to the Secretary's investment options, not to

_____

[3] *See* Act of May 25, 1918, Pub. L. No. 65-159, § 28, 40 Stat. 561, 591-92; Act of June 24, 1938, Pub. L. No. 75-714, § 1, 52 Stat. 1037, 1037; Act of Nov. 4, 1983, Pub. L. No. 98-146, 97 Stat. 919, 929; Indian Arts and Crafts Act of 1990, Pub. L. No. 101-644, § 302, 104 Stat. 4662, 4667.

the nature or scope of Secretary's accounting obligations — while § 162a(d) and § 4011(a) are of a (separate and distinct) piece and speak directly to traditional trust duties, including the duty to account.[4]

If any doubt remains (and we harbor none), we would still reach the same conclusion because, again, statutory ambiguities in the field of trust relations must be construed for, not against, Native Americans. We would reach the same result, too, because the district court's alternative interpretation invites a strange, maybe even absurd, result. Under the district court's reading, the government's accounting obligations extend only to trust fund deposits but *not* withdrawals. The Secretary has to account to headright owners for what goes into their trust fund, but not what comes out. But what could possibly be the point of that? Half of an accounting may be closer to no accounting at all — an assurance deposits are properly handled seems pretty nearly pointless without a corresponding assurance disbursements are too. Under the district court's reading of the law, even the Nation must be denied a full accounting of its funds — the court's interpretation, after all, applies to *all* Native American trust funds, tribal as well

---

[4] The parties contest whether § 162a(d) might itself give rise to a duty to account to individual tribal members. *Cobell* thought not, suggesting that only § 4011(a) gave rise to an accounting duty enforceable by individual tribal members. *See Cobell*, 240 F.3d at 1105-06. Given that we agree § 4011(a) provides what the plaintiffs seek, we have no reason to address whether § 162a(d) might as well. The same goes for § 4044, also cited by the plaintiffs as a potential source of authority for an accounting duty.

as individual. Yet, even the government itself has never taken so bold a position. To the contrary, the government boasts in its briefs that it recently provided the Nation with a full accounting, if after being sued to provide one. We can well imagine Congress choosing either to grant or deny the right to request an accounting, but no one has advanced any reason why it might adopt an almost useless halfway measure for tribes and individual tribal members alike. Indeed, the government does next to nothing to defend the district court's reading of § 162a(a) — two sentences in a 49-page brief say the district court was right, no more.

The government invests more energy — though still only a paragraph — pursuing an alternative ground for affirmance. It asks us to hold that § 4011(a)'s accounting obligations run *only* to the Osage Nation, not individual tribal members like the plaintiffs before us. The government doesn't dispute that § 4011(a), properly read, *does* require it to provide an accounting. But it contends only a tribe may demand one.

We are at a loss to see how we reach that interpretive destination. Even on a first approach, the government's position appears more than a little anomalous. The government recognizes that the 1906 Act creates a trust relationship running directly between the government and individual Osage headright owners, but it suggests one of the usual fiduciary duties attendant to a typical trust relationship here belongs *only* to someone else (the tribe). Of course, it's not impossible

Congress could have chosen to rearrange normal trust principles in this way, but the government identifies *nothing* in the text or structure of the relevant laws suggesting such a design. To the contrary, § 4011(a) indicates that the government's accounting duty applies to all funds "held in trust . . . for the benefit of an Indian tribe *or an individual Indian*." In turn, the 1906 Act requires the Secretary to hold Osage mineral wealth in trust for *individual* Osage headright owners. Taken together, these provisions suggest a trust relationship and an attendant accounting duty running directly between the government and individual Osage headright owners like the plaintiffs before us. We cannot detect so much as a whiff suggesting they grant accounting privileges *only* to the tribe. While (again) we see no ambiguity in the relevant statutory language about all this, and while (again) the government has not even attempted to identify statutory language or features that might give rise to an ambiguity, even if we could somehow conjure up the sort of ambiguity the government seems to assume but never identifies, it would still have to be resolved in the plaintiffs' favor.[5]

The government briefly trots out a second alternative ground for affirming the district court — only to trot it back in just as quickly. The government points to its settlement of the Osage Nation's recently litigated accounting claim and

---

[5] We do not purport to resolve whether non-Osage headright owners who received their interests lawfully under applicable congressional statutes might also have a right to seek an accounting.

notes that, as part of the deal, the tribe agreed to waive "on behalf of . . . any Headright Holders" any claims they might have to seek an accounting. Given this waiver, the government says "it is questionable whether" the plaintiffs can pursue their claim. Gov't Br. at 38 n.5. But this discussion appears only in a footnote. The footnote itself — notably — stops short of claiming that the tribe has the power to waive individual tribal members' claims. Indeed, the footnote cites no authority one way or the other on the "question" it highlights. And when we asked the government at oral argument to clarify its position on the "question" its footnote posed it retreated still further, disclaiming any suggestion that the Osage Nation's waiver might bind the individual plaintiffs in this case. Given these strange circumstances, we hold any argument in this direction doubly waived — first for a lack of adequate development in briefing, then for being intentionally abandoned at oral argument. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004).

Neither does the government give us any other basis for affirming the district court's judgment. With the district court's rationale unsustainable on its own terms and the government's two alternatives unmoored from the relevant statutes or withdrawn, we are left with no choice but to reverse.

Having come this far, we find another line of questions impossible to avoid. What must the government do to discharge its accounting duty provided under § 4011(a)? Apparently the government has satisfied the Nation's accounting

-17-

demands: what must it do to satisfy the individual tribal members before us? Strictly speaking, we may not have to reach questions like these. The district court dismissed the case on the basis that no accounting duty existed and to reverse we need only find the rationales it and the government have offered for that conclusion lacking. Surely, as well, the exact contours of the accounting have to be decided by the district court on remand with the assistance of the parties. *See Cobell*, 573 F.3d at 813 ("[T]he proper scope of the accounting ultimately remains a question for the district court . . . ."). But after so many years fighting over pleadings and now facing the prospect the case might at last progress beyond the motion to dismiss stage, we don't doubt the district court and parties would appreciate some guidance and we will "provide as much guidance as we can." *Id.*

We can say this much. Section 4011(a) holds the government to "account for the daily and annual balance of all funds . . . deposited or invested pursuant to section 162a of this title." No one before us disputes that the plaintiffs' current complaint adequately alleges that their trust funds are deposited in a bank pursuant to section 162a(a), though this question may of course be the subject of factual exploration on remand. Assuming that hurdle is overcome, the statutory language doesn't spell out *how* the promised accounting must be conducted. But, as we have seen, in § 4011(a) Congress chose to reference a traditional equitable remedy from trust law. And in a traditional equitable accounting, the trial court

-18-

possesses considerable discretion "to mould" the nature and scope of the accounting "to the necessities of the particular case." *Cobell*, 573 F.3d at 813 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).  A green eye-shade death march through every line of every account over the last one hundred years isn't inevitable:  the trial court may focus the inquiry in ways designed to get the plaintiffs what they need most without imposing gratuitous costs on the government.  While the necessities of each case may be particular and for the trial court to determine in the first instance, any case seeking to do equity must seek to balance the often warring (and admittedly incommensurate) considerations of completeness and transparency, on the one hand, and speed, practicality, and cost, on the other.

On that first hand, we can add that the plaintiffs are entitled not only to some measure of information about the government's handling of deposits, as the district court thought, but also to some measure of information about disbursements.  The scope of a traditional equitable accounting includes, after all, some degree of information about both receipts and disbursements.  *See, e.g.*, 2 Joseph Story, *Commentaries on Equity Jurisprudence, as Administered in England and America* § 1275, at 506-07 (1866).  And as we've seen, § 4011(a) guarantees an accounting, not half of one.

On the other hand, equity does not require an accounting so punctilious, so expensive, and so laboriously long in coming that the final volume is released

-19-

with great fanfare only after generations of beneficiaries have come in and gone out, the Bureau of Indian Affairs has been forced to turn a blind eye to other pressing needs in the Native American community, the public fisc has been thirstily drained, and only the lawyers have grown fat. This case may be like *Cobell* in the sense that it involves a claim for an accounting, but no one should aspire to see the case grow so old and the number of appeals mount so high that we have to resort to double digit Roman numerals to describe them (*Fletcher X, XI, . . . XIX*) as the litigants did in *Cobell*. The plaintiffs before us have expressly acknowledged that no one will benefit by prolonging this litigation needlessly and that the government is entitled to a degree of discretion in choosing an appropriate accounting methodology. *See* Aplt. Br. at 27 (citing *Cobell*, 240 F.3d at 1104); *see also Cobell*, 573 F.3d at 814 (noting that the district court may use statistical sampling rather than force a complete historical accounting). About this, they are right again.

Even more particularly, we can say this. We don't doubt that the plaintiffs ultimately hope to prove that the government has sent money to persons ineligible to receive headright shares under the various amendments to the 1906 Act — and, in this way, improperly diminished their pro rata share. But in an accounting action, trust beneficiaries are entitled only to information that is "reasonably necessary to enable [them] to enforce [their] rights under the trust." Restatement (Second) of Trusts § 173 cmt. c. They are not entitled to information that only

loosely relates to their own personal beneficial interests, or to information that is unlikely (because it is so old, or so *de minimis*, say) to have a meaningful effect on their beneficial interests. Newman et al., *supra*, § 962 & n.8. And in any subsequent litigation it will be their burden to prove a breach of trust, not the government's burden to disprove it. *See id.* §§ 968, 971. To say that the plaintiffs have a right to an accounting, then, is to say that it must give some sense of where money has come from and gone to — not to say it must disprove through a title search or otherwise any breach of trust theory the plaintiffs may later choose to posit. Neither does the plaintiffs' accounting right necessarily mean that they will even be able to attack through collateral litigation headright transfers long ago approved according to statutorily prescribed processes — processes that already have in place means for objectors to challenge proposed headright transfers. *See, e.g.*, Act of Oct. 21, 1978, Pub. L. No. 95-496, § 5(a), 92 Stat. 1660, 1661 (discussing notice and hearing required before Secretary can approve transfer of headright interest by will). Put simply, a duty to account is a duty to account, not a duty to respond to and disprove any and all potential breaches of fiduciary duty a beneficiary might wish to pursue once the accounting information is in hand.

It may be too much to hope, but in the end it may be the government can satisfy its accounting duty very simply. The government has suggested that in its settlement with the Osage Nation it has discharged its accounting duty to the

-21-

Nation.  If this is true, this lawsuit, already about to reach its teenage years, might come to a speedy end at last.  It may very well be within the district court's considerable discretion simply to order the government to share with the plaintiffs something like it has already shared with the Nation.  Indeed, one can't help but wonder why the government hasn't already offered to give the plaintiffs what it has given the Nation.  The government says it is worried about privacy concerns associated with handing over to the plaintiffs information about other headright owners.  But the government leaves that issue undeveloped before us and never suggests it is insurmountable.  So it is we must ask the district court to work through the matter — though with much hope it can be worked through promptly and perhaps bring this case to rest.[6]

The plaintiffs' motion to file a supplemental appendix is denied and the judgment of the district court is reversed.  The case is remanded for further proceedings consistent with this opinion.

---

[6] Besides their accounting claim, the district court also dismissed without prejudice the plaintiffs' separate claim charging the government with improper trust fund distributions.  The plaintiffs informed us at oral argument that they do not seek a ruling from us now on that claim.  Accordingly, we decline to reach it.