McHUGH, Circuit Judge.
This case arises out of an ignominious event in the history of this Nation. In 1864, the United States Army conducted an unprovoked attack on a group of unarmed Indians, who had relocated to an area next to the Sand Creek River in the Territory of Colorado at the direction and under the protection of the Territorial Governor. When what has become known as the Sand Creek Massacre was over, most of the Indians were dead, including many women and children. After an investigation, the United States publicly acknowledged its role in the tragedy and agreed to pay reparations to certain survivors of the massacre. But those reparations were never paid.
Plaintiffs are descendants of the victims of the 1864 Sand Creek Massacre and bring this action for an accounting of the amounts they allege the U.S. government holds in trust for payment of reparations to their ancestors. Because the United States has not waived its sovereign immunity, we affirm the district court’s dismissal of such for lack of subject matter jurisdiction.
I. BACKGROUND
On February 18,1861, the United States entered into a treaty with the Arapaho[1] and Cheyenne Tribes (the Tribes), ceding to the Tribes a tract of land along the Sandy Fork of the Arkansas River and promising to protect the Tribes “in the quiet and peaceful possession of the said tract of land so reserved for their future home, and also their persons and property thereon, during good behavior on their part.”[2] Despite this promise, in June 1864, Territorial Governor and Superintendent of Indian Affairs John Evans conspired with Colonel John Chivington of the U.S. Army to relocate the Tribes to Fort Lyon in the Colorado Territory. When the Tribes arrived in late October 1864, the commander of Fort Lyon, Major Scott Anthony, gave them permission to camp at nearby Sand Creek and to hunt bison. But he first disarmed the Tribes, leaving them with only minimal hunting weapons.
With the approval of Major Anthony, Colonel Chivington ordered an attack on the Tribes settled at Sand Creek. Approximately 700 U.S. troops marched for Sand Creek, arriving at sunrise on November 29, 1864. Despite the fact the Indians flew both an American flag and a white truce flag over their camp, the U.S. troops attacked. Indians attempting to flee or hide were hunted down and killed, and some of the attackers then looted and mutilated the bodies. The exact number killed at Sand Creek remains unknown, but eyewitness accounts estimate the majority were women and children.
After an investigation, Colonel Chiving-ton and Major Anthony resigned their commissions. And on October 14, 1865, the United States entered into the Treaty of Little Arkansas, which expresses the United States’ condemnation of “the gross and wanton outrages perpetrated against certain bands of Cheyenne and Arrapahoe Indians ... at Sand Creek, Colorado Terr ritory.” See Treaty between the United States of America and the Cheyenne and Arrapahoe Tribes of Indians, art. VI, Oct. 14, 1865, 14 Stat. 703 [hereinafter Treaty *1238 of Little Arkansas]. The Treaty of Little Arkansas then provides:
[T]he government being desirous to make some suitable reparation for the injuries then done, will grant three hundred an[d] twenty acres of land by patent to each of the following-named chiefs of said bands ... and will in like manner grant to each other person of said bands made a widow, or who lost a parent upon that occasion, one hundred and sixty acres of land, the names of such persons to be ascertained under the direction of the Secretary of the Interi-or____Said lands shall be selected under the direction of the Secretary of the Interior within the limits of country hereby set apart as a reservation for the Indians parties to this treaty.... The United States will also pay in United States securities, animals, goods, provisions, or such other useful articles as may, in the discretion of the Secretary of the Interior, be deemed best adapted to the respective wants and conditions of the persons named in the schedule hereto annexed, they being present and members of the bands who suffered at Sand Creek, ... as a compensation for property belonging to them, and then and there destroyed or taken from them by the United States troops aforesaid.

Id.

On July 26, 1866, the U.S. Congress appropriated funds to pay the reparations detailed in the Treaty of Little Arkansas. The 1866 Indian Appropriations Act provides, in relevant part:
Arapaho and Cheyenne Indians of the Upper Arkansas River. — For reimbursing members of the bands of Arapaho and Cheyenne Indians who suffered at Sand Creek, ... to be paid in United States securities, animals, goods, provisions, or such other useful articles as the Secretary of the Interior may direct, as per sixth article treaty of October fourteenth, eighteen hundred and sixty-five, thirty-nine thousand and fifty dollars.
Act of July 26, 1866, ch. 266, 14 Stat. 255, 276 [hereinafter 1866 Appropriations Act].
But although the United States promised to pay reparations to the survivors of the Sand Creek massacre and appropriated funds with which to do so, it never fulfilled its obligations.[3] According to Plaintiffs, the funds appropriated by Congress were insufficient to compensate all the victims of the massacre. Moreover, instead of paying reparations directly to the affected individuals as directed, the Secretary of the Interior (Secretary) paid some of the money directly to the Tribes. What funds were not distributed to the Tribes were returned to surplus on August 30, 1872. The United States has never provided an accounting of the reparations paid or attempted to identify the individuals to whom reparations were still owed.
Plaintiffs are descendants of the victims of the Sand Creek massacre. They *1239 brought a class action on behalf of themselves and others similarly situated, alleging the United States acted in the capacity of a trustee over the funds appropriated under the Treaty of Little Arkansas and the 1866 Appropriations Act. Plaintiffs argue the Defendants are in breach of their trust obligations for failing to provide an accounting of the reparations funds held in trust for Plaintiffs’ ancestors. Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argued, alternatively, that the district court lacked subject matter jurisdiction over Plaintiffs’ claims because the United States had not waived its sovereign immunity and that Plaintiffs had failed to state a claim for a trust accounting because they had failed to establish the existence of a trust relationship! The district court dismissed Plaintiffs’ complaint under Rule 12(b)(1), finding it lacked jurisdiction because the United States had not waived sovereign immunity. This appeal followed.
II. DISCUSSION
The United States and its officers enjoy immunity from suit except in instances where the United States has expressly waived that protection. United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (“It long has been established ... that the United States, as sovereign, is immune from suit save as it consents to be sued____” (internal quotation marks omitted)). And because “[t]his immunity extends to injunc-tive relief,” it bars the relief sought by Plaintiffs here — an order directing the government to provide an accounting. See United States v. Murdock Mach. & Eng’g Co. of Utah, 81 F.3d 922, 929-30 (10th Cir.1996) (“Thus, if the government has not consented to suit, the courts have no jurisdiction to either restrain the government from acting or to compel it to act.” (internal quotation marks omitted)). Accordingly, we must determine whether the United States has waived its sovereign immunity to decide if the district court correctly dismissed the Plaintiffs’ claims against these Defendants. See Fletcher v. United States, 730 F.3d 1206, 1211 n. 2 (10th Cir.2013) (“Of course, to sue the government a waiver of sovereign immunity must also be found somewhere in the federal code.”); El Paso Natural Gas Co. v. United States, 750 F.3d 863, 892 (D.C.Cir.2014) (“Because the Government is a defendant here, the Tribe faces three threshold requirements to stating a viable claim for relief at the pleading stage: it must establish federal subject matter jurisdiction, a waiver of sovereign immunity, and" a cause of action.”).
We review the district court’s dismissal on sovereign immunity grounds de novo. Peterson v. Martinez, 707 F.3d 1197, 1205 (10th Cir.2013). And we will find the government has waived sovereign immunity only when its consent to be sued is “unequivocally expressed.” United States v. Nordic Village, Inc., 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (internal quotation marks omitted). Moreover, statutory text purporting to waive governmental immunity is strictly construed “in favor of the sovereign.” Id. at 34, 112 S.Ct. 1011 (internal quotation marks omitted).. “If waiver is not unequivocal from the [statutory] text, the government retains its sovereign immunity. Legislative history cannot supply the necessary unequivocal expression.” Murdock Mach., 81 F.3d at 930; 14 Charles Alan Wright et al., Federal Practice and Procedure § 3654 (“The government will be held to have consented to be sued only if a statute’s text contains an unequivocally clear statement of a waiver of sovereign immunity.”). Thus, to pursue their claims against the government or its employees, Plaintiffs must identify some statutory text *1240 that expressly and unequivocally waives sovereign immunity.

A. The Appropriations Acts Do Not Unequivocally Waive Sovereign Immunity.

The Plaintiffs argue the United States’ waiver of sovereign immunity can be found in a series of statutes enacted by Congress appropriating funds to the Department of Interior, including some funds specifically appropriated for programs associated with Indian tribes (the Appropriations Acts).[4] In relevant part, the most recent version of the Appropriations Acts states:
[Notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.
Act of Oct. 30, 2009, Pub.L. No. 111-88, tit. I, 123 Stat. 2904, 2922 [hereinafter 2009 Act]. According to Plaintiffs, this language both waives the United States’ sovereign immunity and defers accrual of their claim until they receive an accounting of the funds allegedly held in trust by Defendants.[5] We disagree. The Plaintiffs improperly conflate the inherent immunity of the sovereign with the general limitations on the time in which an action must be brought.
Notably, the text of the 2009 Act never mentions sovereign immunity. Because the act cannot be read as an unequivocal waiver of immunity or an express consent to be sued, it cannot provide Plaintiffs with permission to proceed with these claims against the government. See Murdock Mach., 81 F.3d at 930. Instead, the plain language of the 2009 Act tolls the running of the applicable statute of limitations for claims “concerning losses to or mismanagement of trust funds.” 123 Stat. at 2922. The statute provides that a plaintiffs claim will not expire by the mere passage of time, but it does nothing to relieve a plaintiff of the independent obligation to identify an express waiver of sovereign immunity in order to maintain an action against the government. See Fletcher, 730 F.3d at 1211 & n. 2 (indicating parties bringing a claim for an accounting of Indian trust funds must identify a waiver of sovereign immunity). Thus, contrary to Plaintiffs’ position, the 2009 Act— standing alone — does not waive Defendants’ sovereign immunity.

*1241
B. The Federal Circuit Has Not Interpreted the Appropriations Acts to Include a Waiver of Sovereign Immunity.

Despite the complete absence of an express waiver of sovereign immunity, Plaintiffs insist that the 2009 Act authorizes suit against the United States. As support, they point to Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339 (Fed.Cir.2004) (Shoshone II). In Shoshone II, Indian plaintiffs brought a breach of trust action against the United States, alleging the government had mismanaged the tribe’s natural resources. Id. at 1341 — 42. The government argued the tribe’s claims were precluded by the expiration of the applicable statute of limitations, id. at 1344, which bars claims in the Court of Federal Claims “unless the petition thereon is filed within six years after such claim first accrues,” 28 U.S.C. § 2501. The tribe argued the 2003 version of the Appropriations Acts rescued the otherwise expired claims for misappropriation of trust assets by providing that they did not accrue until after the government had provided an accounting. Shoshone II, 364 F.3d at 1344.
In addressing the tribe’s arguments, the Federal Circuit stated, “By the plain language of the [2003 version of the Appropriations Acts], Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes’ cause of action until an accounting is provided.” Id. at 1346. Plaintiffs seize upon this language to argue the 2009 Act constitutes a waiver of immunity. We are not persuaded.
First, Shoshone II arose in the context of claims under the Tucker Act (28 U.S.C. § 1491) and the Indian Tucker Act (28 U.S.C. § 1505), which each contain language expressly waiving sovereign immunity for claims seeking money damages. Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States, 51 Fed.Cl. 60, 62 (2001) (Shoshone I). The Court of Federal Claims had already determined in Shoshone I that the United States had waived its sovereign immunity under those statutes. Id. The issue in Shoshone II was the impact of the Appropriations Acts on claims under the Tucker Act and Indian Tucker Act that would have been barred under the statute of limitations normally applicable. Shoshone II, 364 F.3d at 1345-46; Shoshone I, 51 Fed.Cl. at 62-63. Here, unlike in Shoshone II, the Plaintiffs have not identified a statute other than the Appropriations Acts that expressly waives sovereign immunity with respect to their claims.
Second, although the language Plaintiffs cull from the Federal Circuit’s Shoshone II decision may be imprecise, placing that single sentence in context clarifies that the court was not equating a statute tolling a limitations period with one expressly waiving sovereign immunity. Rather, the Federal Circuit’s discussion of the Appropriations Acts is focused on how statutes of limitations — and statutes modifying limitations periods-act as conditions on waivers of sovereign immunity. Shoshone II, 364 F.3d at 1346 (“The statute of limitations provision of 28 U.S.C. § 2501 places an express limit on the Government’s waiver of sovereign immunity for every claim within the jurisdiction of the Court of Federal Claims.” (emphasis added)). Under the court’s analysis, the express waivers of sovereign immunity in the Tucker Act and the Indian Tucker Act were effective only for claims filed within the applicable limitations period. Because the Appropriations Acts prevented the accrual of the Indians’ claims, it effectively tolled the statute of limitations, thereby causing the express waivers of sovereign immunity contained in the Tucker Act and Indian Tucker Act to remain viable. Id. at 1347. When placed in context, the Federal Circuit’s statement that the Appropriations *1242 Act both waives sovereign immunity and defers the running of the statute of limitations makes sense. Without the tolling of the statute of limitations, the claims would be stale and the waiver of immunity in the Tucker and Indian Tucker Acts would no longer be effective.
Accordingly, we do not read Shoshone II as holding that the Appropriations Acts’ impact on the running of the applicable statute of limitations can also serve as an express waiver of sovereign immunity in the absence of an independent statutory waiver of immunity. Instead, we read Shoshone II as recognizing that a plaintiff must satisfy two separate obligations to pursue a claim against the government: (1) the identification of an express waiver of sovereign immunity; and (2) the initiation of a suit against the government before the statute of limitations for the plaintiffs claim runs and effectively negates that waiver.
Third, even if we agreed with Plaintiffs’ reading of Shoshone II, we could not follow the Federal Circuit. To do so would be inconsistent with the well-established rule — found in both Supreme Court and Tenth Circuit precedent — that waivers of sovereign immunity must be unequivocally expressed. See Nordic Village, 503 U.S. at 33, 112 S.Ct. 1011; Murdock Mach., 81 F.3d at 930. Thus, the Plaintiffs must identify express statutory language waiving immunity, and any ambiguity in that language must be construed in favor of the sovereign and therefore in favor of immunity. Nordic Village, 503 U.S. at 34, 112 5.Ct. 1011. Against the backdrop of this precedent, the 2009 Act does not waive the United States’ immunity from Plaintiffs’ claims.
Finally, we think it axiomatic that statutes of limitations and statutes affecting sovereign immunity are distinct. A party may well have a valid claim that is not barred by any statute of limitations, but if the government has not waived immunity, we lack jurisdiction to consider the claim. Conversely, if the government waives immunity as to a class of claims, a plaintiff may still be barred from bringing the claim by the expiration of the applicable limitations period. Statutes of limitations — which protect defendants generally from stale claims — and sovereign immunity — which recognizes the unique power of the sovereign to decide whether and for what types of claims it will consent to be sued — are separate concepts and each must be met to pursue claims against the government. Even if the 2009 Act were applicable here, Plaintiffs could meet only one of these requirements because the Act contains no express waiver of sovereign immunity.

C. Even if the Appropriations Acts Waived Sovereign Immunity, Such Waiver Would Not Be Applicable Here.

As discussed, the Appropriations Acts do not waive sovereign immunity. But even if Plaintiffs were correct that the 2009 Act did contain an express waiver of sovereign immunity, we would nonetheless lack subject matter jurisdiction to consider Plaintiffs’ claims. On its face, the 2009 Act applies only to claims “concerning losses to or mismanagement of trust funds.”[6] *1243 2009 Act, 123 Stat. at 2922 (emphasis added). The act thus presupposes the existence of a trust relationship between a plaintiff and the United States. As explained below, the Treaty of Little Arkansas and the 1866 Appropriations Act did not create a trust relationship between Plaintiffs and Defendants. And because no trust relationship ever existed, any purported waiver of sovereign immunity contained in the 2009 Act would not apply to Plaintiffs’ claims.
1. The Government’s Assumption of the Fiduciary Duties Associated with a Trust Relationship Must Be Established by Express Statutory or Regulatory Language.
The Supreme Court and the Tenth Circuit have recognized a general trust relationship between the U.S. government and Indian tribes. See, e.g., United States v. Jicarilla Apache Nation, 564 U.S. 162, 131 S.Ct. 2313, 2324, 180 L.Ed.2d 187 (2011); Fletcher v. United States, 730 F.3d 1206, 1208 (10th Cir.2013). The Supreme Court has cautioned, however, that this general trust relationship “is not comparable to a private trust relationship” with all of its attendant fiduciary obligations. Jicarilla, 131 S.Ct. at 2323 (internal quotation marks omitted). Rather, the trust relationship between the U.S. government and Indian tribes is a creature of statute. Id. That is, “Congress may style its relations with the Indians a ‘trust’ without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is ‘limited’ or ‘bare’ compared to a trust relationship between private parties at common law.” Id. Thus, “[t]he government’s relationship with and duties to Native American tribes are generally defined in the first instance by applicable statutes and regulations.” Fletcher, 730 F.3d at 1208 (internal quotation marks omitted).
Notwithstanding this distinction, common-law trust obligations remain relevant to our analysis. Specifically, we look “to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed.” Jicarilla, 131 S.Ct. at 2325. “But the applicable statutes and regulations establish [the] fiduciary relationship and define the contours of the United States’ fiduciary responsibilities.” Id. (alteration in original) (internal quotation marks omitted). Thus, these common-law principles come into play only if a plaintiff can first “identify a specific, applicable, trust-creating statute or regulation that the Government violated.” Id. (internal quotation marks omitted).
In a series of cases, the Supreme Court has established the basic contours of the statutory language sufficient to create a fiduciary trust relationship between the government and Indian tribes. First, in United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (Mitchell I), the Court considered whether the Indian General Allotment Act of 1887 authorized an award of damages against the United States for mismanagement of forests held in trust for Indian tribes. Id. at 536-37, 100 S.Ct. 1349. Under the General Allotment Act, the government retains title to lands allotted to individual Indians for grazing and agriculture for a period of 25 years “in trust for the sole use and benefit of the Indian to whom such allotment shall have been made.” Id. at 540-41, 100 S.Ct. 1349 (emphasis added). The plaintiffs sued the government, alleging it had breached its fiduciary duties by improperly managing forest land held in trust. Id. at 537, 100 S.Ct. 1349. The *1244 Supreme Court rejected the plaintiffs’ claims, holding the General Allotment Act “created only a limited trust relationship ... that does not impose any duty upon the Government to manage timber resources” because the act did not “unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands.” Id. at 542, 100 S.Ct. 1349. Accordingly, the Supreme Court concluded that any right to recover from the government for mismanagement of the allotted forest lands had to be found in sources other than the General Allotment Act. Id. at 546, 100 S.Ct. 1349. The Supreme Court then remanded the matter to the Court of Claims for further proceedings consistent with its decision. Id.
In a subsequent appeal after remand, the tribes followed the Supreme Court’s direction by identifying statutes other than the General Allotment Act, which they argued established a trust relationship. See generally United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II). Specifically, in Mitchell II, the Indian tribe relied on statutes which established a comprehensive framework within which the federal government managed Indian timber resources “based upon the Secretary’s consideration of the needs and best interests of the Indian [landowner] and his heirs.” Id. at 222, 224, 103 S.Ct. 2961 (internal quotation marks omitted). And the Office of Indian Affairs had promulgated extensive regulations governing its management of “Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests.” Id. at 220, 103 S.Ct. 2961. The Court concluded the statutes and regulations at issue “clearly established] fiduciary obligations of the Government in the management and operation of Indian lands and resources,” and further held the tribes could pursue a claim for damages based on the breach of that trust obligation. Id. at 226, 103 S.Ct. 2961.
From Mitchell I and Mitchell II it is apparent that “neither the general trust relationship between the federal government and Indian Tribes nor the mere invocation of trust language in a statute (as in the Allotment Act) is sufficient to create a cause of action for breach of trust.” El Paso Natural Gas Co. v. United States, 750 F.3d 863, 893 (D.C.Cir.2014). Rather, our inquiry must focus on the express language of the statute or regulation to determine whether it expressly creates rights or imposes duties of a fiduciary nature. Id. at 894 (“[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions.”).
In a subsequent pair of companion cases, United States v. Navajo Nation, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d,60 (2003) (Navajo I), and United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), the Supreme Court further elaborated on these principles. In Navajo I, the tribe sought money damages against the government, arguing the Secretary had breached his fiduciary obligations by obtaining a substandard royalty rate for certain coal leases on Indian land. 537 U.S. at 493, 123 S.Ct. 1079. The tribe relied on the Indian Mineral Leasing Act of 1938 (IMLA) as the source of the Secretary’s fiduciary obligations. Id. Examining the statutory language, the Court concluded IMLA did not impose fiduciary obligations on the Secretary. Id. at 507, 123 S.Ct. 1079. Instead, IMLA merely required the Secretary’s approval of coal leases negotiated by Indian tribes and third parties. Id. The Court also noted that the text of IMLA was even less compelling than that found insufficient to create a fiduciary obligation in Mitchell I because no provision of *1245 IMLA or its implementing regulations contained any trust language with respect to coal leases. Id. at 508, 123 S.Ct. 1079.
In contrast, in White Mountain, the Court allowed the Indians’ claim for breach of trust to proceed. There, the tribes relied on the “1960 Act,” which provided that the United States would hold the former Fort Apache Military Reservation in trust for the White Mountain Apache Tribe. 537 U.S. at 468-69, 123 S.Ct. 1126. The 1960 Act also specifically reserved the right of the Secretary “to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.” Id. at 469, 123 S.Ct. 1126. The Secretary exercised its rights to use the land, and the tribe eventually brought suit, arguing the Secretary had breached its fiduciary obligation to maintain and preserve trust property. Id. Despite the brevity of the 1960 Act, the Court held its language went “beyond a bare trust and permitted] a fair inference that the Government is subject to duties as a trustee.” Id. at 474, 123 S.Ct. 1126. Important to the Court’s reasoning, the 1960 Act vested the Secretary with “discretionary authority to make direct use of portions of the trust corpus.” Id. at 475, 123 S.Ct. 1126.
Collectively, these cases stand for the proposition that an Indian plaintiff asserting the existence of a trust and the breach of corresponding fiduciary obligations “must first identify a substantive source of law that establishes that specific fiduciary duty.” El Paso, 750 F.3d at 895 (emphasis and internal quotation marks omitted). Although a statute’s invocation of trust language is not dispositive, it can be informative. See id. And while control over property belonging to Indian tribes can be a factor' in our analysis, “the real question is whether the particular statute or regulation establishes rights and duties that characterize a conventional fiduciary relationship.” Id.
2. Plaintiffs Have Failed to Identify Express Statutory or Regulatory Language that Imposes Fiduciary Duties on the Government with Respect to the Sand Creek Reparations.
Plaintiffs rely on Article VI of the Treaty of Little Arkansas and the 1866 Appropriations Act as the substantive sources of law establishing fiduciary obligations on the United States. Article VI granted 320 acres of land to each of the named chiefs of the Tribes and 160 acres of land to “each other person of said bands made a widow, or who lost a parent” during the massacre, with “the names of such persons to be ascertained under the direction of the Secretary of the Interior.” Treaty of Little Arkansas, art. VI. These grants of land expressly prohibited any leases, alienations, or devises for a period of 50 years. Id. In addition, the United States promised to pay reparations “in United States securities, animals, goods, provisions, or such other useful articles as may, in the discretion of the Secretary of the Interior, be deemed best adapted to the respective wants and conditions of the persons named in the schedule hereto annexed.” Id. These payments were to be made “as a compensation for property belonging to them, and then and there destroyed or taken from them by the United States troops.” Id. Congress subsequently appropriated $39,050 to pay these reparations. 1866 Appropriations Act, 14 Stat. at 276.
Plaintiffs argue that the treaty, in combination with the appropriation of funds, created an enforceable trust relationship such that they are now entitled to an accounting from the Secretary. But neither the treaty nor the 1866 Ap *1246 propriations Act contains any express trust language. At best, Plaintiffs point to language appropriating a sum of money for the Secretary’s use in paying reparations to specific individuals according to the Secretary’s assessment of that individual’s “wants and conditions.” This language represents only an obligation to make a one-time payment to specific individuals who were directly injured by the loss of family members or property during the massacre. Cf. Mitchell II, 463 U.S. at 222, 224, 103 S.Ct. 2961 (holding that statutes which established a comprehensive framework for management of Indian timber resources for the benefit of the Indian landowner “and his heirs,” created a fiduciary trust relationship). There is no indication from the language of either the treaty or the 1866 Appropriations Act that Congress intended to create ongoing fiduciary obligations to these individuals or their heirs. And unlike Mitchell II, there is nothing in either the treaty or the 1866 Appropriations Act that contemplates the government’s management of Indian property under an elaborate regulatory scheme which directs the government to do so in the best interests of the current and future beneficiaries of the proceeds from the resources on that property. Nor do these congressional directives contemplate the government’s direct use of real property held in trust for an Indian tribe, as was the case in White Mountain. See 537 U.S. at 475, 123 S.Ct. 1126. Instead, they simply direct the Secretary to make a one-time expenditure of money in a particular manner.
Not every allocation of funds for a particular purpose creates fiduciary obligations enforceable by the heirs of the intended recipients of those funds. Nor does every grant of discretionary authority in the dispersal of allocated funds create such fiduciary obligations. In this case, there is no forward-looking statutory language or regulatory scheme establishing specific fiduciary obligations on the part of the Secretary. In Wolfchild v. United States, 559 F.3d 1228 (Fed.Cir.2009), the Federal Circuit rejected a claim that similar acts appropriating funds to be paid to Indians established an enforceable trust relationship. In 1862, a group of Minnesota Sioux rebelled against the United States. Id. at 1232. During the uprising, a subset of the Sioux, the Mdewakantons, remained peaceful. Id. In appreciation, Congress authorized the Secretary to set aside allotments of land for the Mdewakr antons. Id. Through a series of appropriations, Congress subsequently authorized funds to be used for the benefit of the Mdewakantons. Id. at 1233-34. The plaintiffs argued these appropriations acts created a trust for the Mdewakantons and their descendants. Id. at 1236. The Federal Circuit disagreed:
Although the Appropriations Acts impose some limited restrictions as to how the appropriated funds are to be spent, those restrictions are consistent with the kinds of directions that are routinely contained in appropriations statutes dictating that the appropriated funds are to be spent for a particular purpose. The simple statutory directives as to the expenditures authorized by the Appropriations Acts do not evidence an intention on Congress’s part to create a legal relationship between the Secretary of the Interior and the ... Mdewakantons in which the Secretary was assigned particular duties as trustee and the Mdewakantons were given enforceable rights as trust beneficiaries.
Id. at 1238.
The Wolfchild court’s reasoning is persuasive. The simple act of appropriating funds for a particular purpose does not imply that Congress intended to create an enforceable trust relationship. Were we *1247 to hold otherwise, any act in which Congress directed funds to be expended in a particular manner would create enforceable fiduciary obligations vis-a-ids the beneficiaries of such funds and their descendants. Such a result is directly contrary to the Supreme Court’s direction that the statute must contain express language creating such fiduciary obligations to create an enforceable trust.
Finally, Plaintiffs attempt to avoid the clear holdings of Mitchell. I, Mitchell II, Navajo I, and White Mountain because these cases involved claims for damages, not claims for a trust accounting. Plaintiffs’ argument misses the mark. In order for Plaintiffs to claim any right to a trust accounting, there must first be a trust. The Supreme Court’s precedents in Mitchell I, Mitchell II, Navajo I, and White Mountain establish the guidelines by which we determine whether a statute or regulation creates a trust relationship. As discussed, the relevant treaty and statute here did not. Without a trust, there is no right to a trust accounting.
III. CONCLUSION
To proceed against the government, the Plaintiffs must identify an express waiver of its sovereign immunity. Although the Appropriations Acts effectively toll the running of the statute of limitations, they contain no express language waiving sovereign immunity. Even if the Appropriations Acts could be read to expressly waive immunity, they are limited to claims for misappropriation of trust assets. Neither the Treaty of Little Arkansas nor the 1866 Appropriations Act imposes fiduciary trust obligations on the government. And in the absence of such a trust relationship, any purported waiver of immunity contained in the 2009 Act is inapplicable to Plaintiffs’ claims. As such, even if we agreed with Plaintiffs that the 2009 Act expressly waives the United States’ immunity, it could not do so in this case. Accordingly, Plaintiffs have not identified a waiver of the United States’ sovereign immunity. Absent such a waiver, the courts lack the power to grant Plaintiffs relief, and we therefore AFFIRM the district court’s dismissal of this action for lack of subject matter jurisdiction.

. Arapaho is alternatively spelled "Arapaho,” "Arapahoe,” and "Arrapahoe” in the parties’ briefing and original treaty documents. For consistency, we will use "Arapaho” unless directly quoting from a source utilizing an alternate spelling.

. Because this appeal is from the grant of a motion to dismiss, we recite the facts as alleged in the Plaintiffs’ complaint and in the light most favorable to them. See Albers v. Bd. of Cty. Comm'rs, 771 F.3d 697, 699 n. 1 (10th Cir.2014).

. On October 28, 1867, the United States entered into another treaty with the Tribes. See Treaty between the United States of America and the Cheyenne and Arapahoe Tribes of Indians, Oct. 28, 1867, 15 Stat. 593 [hereinafter Treaty of Medicine Lodge Creek]. The Treaty of Medicine Lodge Creek purported to establish a new reparations scheme for the Tribes "[i]n lieu of all sums of money or other annuities provided to be paid to the Indians herein named, under the [Treaty of Little Arkansas].” Id. art. X. Although the Treaty of Medicine Lodge Creek would seem to supplant the terms of the Treaty of Little Arkansas, Plaintiffs assert the Treaty of Medicine Lodge Creek was never properly concluded. We are not required to accept as true Plaintiffs' legal conclusion regarding the status of the Treaty of Medicine Lodge Creek. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). But because the validity of the Treaty of Medicine Lodge Creek does not alter our analysis in this case, we need not determine whether Plaintiffs are correct that it was never properly concluded.

. Plaintiffs also make passing reference to 5 U.S.C. § 702 as a source of the district court’s jurisdiction in this case. But as Defendants have correctly argued, § 702 does not operate retroactively to waive sovereign immunity for claims accruing prior to its effective date of October 21, 1976. See United States v. Mur-dock Mach. & Eng’g Co. of Utah, 81 F.3d 922, 929 n. 8 (10th Cir.1996). Plaintiffs have failed to address the retroactivity of § 702 or otherwise to demonstrate how § 702 applies to waive sovereign immunity for their claims, which arise from actions taken in the 1860s and 1870s — long before the effective date of § 702. Because Plaintiffs have provided no argument or reasoned analysis on appeal supporting their bald assertion that § 702 acts to waive sovereign immunity under the facts of this case, we do not consider this argument further.

. Congress has included substantially similar language in Department of Interior appropriations statutes since 1990. See, e.g., Act of Nov. 5, 1990, Pub.L. No. 101-512, tit. I, 104 Stat. 1915, 1930; Act of Feb. 20, 2003, Pub.L. No. 108-7, Div. F, tit. I, 117 Stat. 11, 236; Act of Dec. 26, 2007, Pub.L. No. 110-161, Div. F, tit. I, 121 Stat. 1844, 2115.

. The act, on its face, also is limited to claims for "losses to or mismanagement” of trust funds. 2009 Act, Pub.L. No. 111-88, tit. I, 123 Stat. 2904, -2922. Thus, it is unclear that it would apply to Plaintiffs-' claim for a trust accounting, particularly where Plaintiffs have expressly disavowed any claim for damages stemming from the loss or mismanagement of trust funds. And reading the 2009 Act to encompass Plaintiffs' claim for an accounting would mean the statute tolls the accrual of claims for a trust accounting until after an accounting has been provided, thereby making the right to seek an accounting eternal. But we need not decide this issue because we conclude the 2009 Act does not apply to *1243 Plaintiffs’ claims in the absence of a trust relationship.