# United States Court of Appeals for the Federal Circuit

_____

**WILLIAM FLETCHER, TARA DAMRON, RICHARD LONGSINGER, KATHRYN REDCORN,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2021-1625

_____

Appeal from the United States Court of Federal Claims in No. 1:19-cv-01246-LAS, Senior Judge Loren A. Smith.

_____

Decided: February 24, 2022

_____

JASON AAMODT, Indian & Environmental Law Group, Tulsa, OK, argued for plaintiffs-appellants.

BRIAN C. TOTH, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by MARY GABRIELLE SPRAGUE, JEAN E. WILLIAMS.

_____

Before PROST, TARANTO, and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

Plaintiffs William Fletcher, Tara Damron, Richard Longsinger, and Kathryn Redcorn, individual holders of Osage headrights, filed suit against the United States in the Court of Federal Claims (Claims Court) seeking damages resulting from breach of fiduciary duties relating to royalties from the Osage mineral estate. *Fletcher v. United States*, 151 Fed. Cl. 487 (2020) (*Claims Court Decision*). Because the Claims Court incorrectly concluded that the plaintiffs had no standing and had failed to identify a source of money-mandating obligation as required under the Tucker Act, we reverse the dismissal of the complaint. We also vacate the Claims Court's decision on the availability of a damages accounting and the striking of declarations.

BACKGROUND

Congress established a reservation for the Osage tribe in Oklahoma Territory in 1872, which, years later, was found to have "mammoth reserves of oil and gas." *Fletcher v. United States*, 730 F.3d 1206, 1207 (10th Cir. 2013) (*Fletcher 2013*). At one point, Osage County would become "one of the largest oil producing counties in the United States." *Osage Tribe of Indians of Okla. v. United States*, 72 Fed. Cl. 629, 648 (2006) (*Osage 2006*). In 1906, after the discovery, Congress passed legislation that severed the subsurface mineral estate and placed it into trust with the federal government as trustee. Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory, and for Other Purposes, Pub. L. No. 59-321, 34 Stat. 539 (1906) (1906 Act); *see Fletcher v. United States*, 854 F.3d 1201, 1203 (10th Cir. 2017) (*Fletcher 2017*); *Osage Tribe of Indians of Okla. v. United States*, 68 Fed. Cl. 322, 323 (2005) (*Osage 2005*).

With the 1906 Act, Congress reserved the mineral estate to the tribe, to be leased with the approval and under the regulations of the Secretary of the Interior. 1906 Act § 3. It also directed the Secretary to hold the royalties

generated from the mineral estate in a trust fund and to distribute the funds, quarterly on a pro rata basis, to tribal members listed on an approved membership roll created pursuant to the 1906 Act.  1906 Act § 4.  Before distribution, a small portion of the royalty funds could be deducted and retained by the tribe for tribal operations.  *Id.*; *see Fletcher 2013*, 730 F.3d at 1207–09.

The right to receive a distribution of the royalties is referred to as a "headright."  Originally, there were 2,229 headright owners, but, over the years, the original headrights have fractionalized through transfers to heirs and devisees, resulting in many more headright owners.  Headrights were transferrable to non-Osage persons and entities until 1978, when Congress "placed strict limits on the transfers of headrights to non-Osages."  *Fletcher v. United States*, 153 F. Supp. 3d 1354, 1370 n.16 (N.D. Okla. 2015) (*Fletcher 2015*).  Of the four Osage headright-owner plaintiffs, three are citizens of the Osage tribe and the fourth is a citizen of the Ponca tribe.

### A. Osage Tribe Litigation in the Claims Court

The present litigation is preceded by two other related litigations—one by the Osage tribe and the other by individual headright owners including the same lead plaintiff in the present case.

The first litigation involved two consolidated suits in the Claims Court, filed in 1999 and 2000 by the Osage tribe on allegations that the federal government violated its duty as trustee of the mineral estate or of the trust fund account (collectively, the *Osage Tribe* litigation).[1]  *Osage 2006*, 72

---

[1]    The Claims Court's opinions vary in referring to the violation as relating to the management of the "mineral estate" or of the "trust funds."  *Compare Osage 2008*, 85 Fed. Cl. at 165 ("violated its duty as trustee of the Osage mineral estate"), *and Osage 2006*, 72 Fed. Cl. at 631 (same),

Fed. Cl. at 631 n.1.  At one point, the Claims Court denied the government's motion to dismiss based on a lack of standing. The government's theory was that only individual headright owners suffered injury from any mismanagement of trust funds because the funds were ultimately distributed to the individuals. *Osage Nation and/or Tribe of Indians of Okla. v. United States*, 57 Fed. Cl. 392, 394 (2003) (*Osage 2003*).  The Claims Court disagreed for the reason that the tribe was the "direct trust beneficiary" of the "tribal trust fund," relying on facts such as the funds sit in the tribal trust fund account for a calendar quarter, the tribe has an interest in the funds when sitting in the account, and a small portion of the funds is not distributed to individual headright owners but instead retained for tribal operations. *Id.* at 395.  The Claims Court also relied on a distinction between mismanagement that occurs while the funds are in the tribal trust fund versus mismanagement "at the point of distribution of the funds to the individual headright holders." *Id.*  Because the alleged mismanagement underlying the breach of fiduciary duty claim was "described as taking place when the funds were within the tribal trust fund," the court found the tribe had a sufficient interest in and a claim to those funds to support standing. *Id.*

In a denial of a second motion to dismiss, for lack of subject matter jurisdiction under the Tucker Act and the Indian Tucker Act, the Claims Court held that the plain language of Section 4 of the 1906 Act establishes money-mandating fiduciary duties owed by the government to the tribe. *Osage 2005*, 68 Fed. Cl. at 327, 330, 333.

---

*with Osage 2005*, 68 Fed. Cl. at 324 ("mismanaged trust funds of the Osage"), *and Osage 2003*, 57 Fed. Cl. at 393 ("breach of fiduciary duty in the mismanagement of tribal trust funds").

After a ten-day trial in 2006, the Claims Court found the government liable for breaching its fiduciary duties by failing to collect the full amount of royalties and failing to invest the royalty revenue. *Osage 2006*, 72 Fed. Cl. at 632–35, 671. In 2008, with litigation still ongoing, a group of individual Osage headright owners (not any of the present plaintiffs) attempted to intervene. *Osage Tribe of Indians of Okla. v. United States*, 85 Fed. Cl. 162 (2008) (*Osage 2008*). The Claims Court denied the motion to intervene partly because, in its view, the individuals had no legal interest in the dispute. They were not a party to the trust relationship, which the court held "exists exclusively between the Tribe and [the government]." *Id.* at 170 n.6, 171–72. To the extent the individuals were arguing they were "entitled to damages as a result of [the government's] breach of fiduciary duties owed directly to them, rather than entitlement to damages as the ultimate payees of any judgment rendered," the Claims Court viewed such argument to be precluded by the law of the case. *Id.* at 170 n.6. Accordingly, the court did not analyze whether the individuals had their own trust relationship with the government under the 1906 Act.

The tribe ultimately settled its claims with the United States for $380 million. J.A. 127. The settlement agreement stated that the tribe, "on behalf of itself and the [h]eadright [h]olders," waived any claim relating to the tribe's trust assets or resources—including the mineral estate and tribal trust account—that was based on violations occurring before September 30, 2011. J.A. 130–32. The agreement also waived "all claims asserted, or that could have been asserted by the Osage Tribe in the [Claims Court] Action." J.A. 130.

### B. Individual Headright Owners' Litigation in the Tenth Circuit

The other litigation was filed by individual headright owners in the Northern District of Oklahoma in 2002 (the

*Fletcher* litigation). The plaintiffs included the same lead plaintiff in this case. The focus of the claims changed over time. Initially, plaintiffs' claims, asserted under the Administrative Procedure Act (APA), related to tribal voting and election rights being tied to headright ownership and the alienation of headrights to non-members of the Osage tribe. *Fletcher v. United States*, 160 F. App'x 792, 793 (10th Cir. 2005). A 2006 amendment to the complaint added an APA claim based on a breach of trust duties for failure to account for the trust funds. *Fletcher v. United States*, 801 F. App'x 640, 642 (10th Cir. 2020). By 2013, the failure-to-account claim was the only remaining count, when plaintiffs appealed its dismissal to the Tenth Circuit. *Fletcher 2013*, 730 F.3d at 1208.

The single legal question on appeal was whether Osage headright holders possessed a legal right to seek an accounting of the trust fund from the Secretary of the Interior. *Id.* The Tenth Circuit held that the individual headright owners did. Writing for the court, now-Justice Gorsuch noted that the 1906 Act "clearly creates a trust relationship—and not just a trust relationship between the federal government and the Osage Nation, but also between the federal government and the individual Osage headright owners." *Id.* at 1209. The language of the 1906 Act requires the government to collect the royalties and place them "to the credit of" each individual headright owner and to disburse them to each individual headright owner on a quarterly basis, with interest. *Id.* (citing 1906 Act § 4(1)–(2), 34 Stat. at 544). Therefore, the 1906 Act "imposes an obligation" on the government "to distribute funds to individual headright owners in a timely (quarterly) and proper (pro rata, with interest) manner." *Id.*

The Tenth Circuit conducted additional analysis to find that, attendant to the trust relationship between the government and individual headright owners, the government has a duty under other statutes to account to the individuals for the daily and annual balances of money held in

trust. *Id.* at 1209–12 (discussing 25 U.S.C. § 4011(a)). As part of this analysis, the Tenth Circuit emphasized that "the trust funds at issue in this case—collected and disbursed under the terms of the 1906 Act—are being held for the benefit of individual members of the Osage Nation." *Id.* at 1209–10. The Tenth Circuit understood that plaintiffs would potentially use the accounting information to show that the government "improperly diminished their pro rata share." *Id.* at 1215 (discussing diminishment in the context of the alleged misdistribution of trust funds to non-Osage individuals).

On remand, the district court required the government's accounting to include a description of each receipt into the trust fund and the distribution of funds for an accounting period starting from 2002 (when the complaint was filed), including the date and dollar amount of each receipt and distribution; a brief description of the source of each trust receipt; the name of the beneficiary to whom each trust distribution was made; for headright distributions, the respective headright share of each headright owner at the time of distribution; and, finally, the amount of interest income generated from the tribal trust account and the date at which such interest was credited to the account. *Fletcher 2015*, 153 F. Supp. 3d at 1371. The Tenth Circuit affirmed the scope of the accounting fashioned by the district court, rejecting the plaintiffs' request to expand the scope to start in 1906 and include more detail. *Fletcher 2017*, 854 F.3d at 1201–07. The government provided the ordered accounting to plaintiff Fletcher in 2017.

### C. Present Litigation by Individual Headright Owners in the Claims Court

Based on allegations that the accounting revealed mismanagement of the trust fund, in 2019 Fletcher and other headright owners filed the present suit in the Claims Court under the Tucker Act and the Indian Tucker Act. The plaintiffs allege they are entitled to money damages for the

government's breach of statutorily imposed trust obligations. The counts in the complaint are (1) a failure to provide adequate systems and controls for accounting for and reporting trust fund balances; (2) a failure to establish written policies and procedures or adequate staffing for trust fund management and accounting;[2] (3) a failure to provide accurate periodic statements of headright owners' accounts; and (4) damages for breach of fiduciary duties. J.A. 41–44. Under the first count, the complaint alleges that the government collected too little interest on royalties segregated for distribution, but before distribution actually took place, and also overpaid gross production taxes. J.A. 42. The third count alleges that the government erred in reporting expenses and simply adjusted the revenue statement to balance the account. J.A. 43.

The Claims Court dismissed the complaint on the government's motion because, in its view, (1) plaintiffs have no standing to pursue their breach of trust claims because they lack a legally protectable interest, *Claims Court Decision*, 151 Fed. Cl. at 496–97; (2) the court lacks jurisdiction under the Indian Tucker Act and the Tucker Act because plaintiffs (a) are not an "identifiable group of Indians," *id.* at 498–99, and (b) fail to identify a money-mandating statutory or regulatory trust duty, *id.* at 499–501; and (3) issue preclusion bars plaintiffs' claims for an expanded accounting, *id.* at 501–04. The Claims Court did not address the alleged insufficiency of the pleading, which the government raised in a request for a more definite statement should the claims survive dismissal for lack of subject matter jurisdiction. J.A. 74, 116.

---

[2]    The plaintiffs have forfeited any challenge to the dismissal of Count II. Oral Arg. 4:43–5:22, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl= 21-1625_12102021.mp3

The Claims Court also granted the government's motion to strike the declarations of Jim Gray and Wilson Pipestem, which the plaintiffs submitted in support of their argument that the settlement agreement between the tribe and the government has no effect on the plaintiffs' claims. *Claims Court Decision*, 151 Fed. Cl. at 494–95.

The plaintiffs appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review de novo the Claims Court's dismissal of a complaint for lack of jurisdiction. *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, construing them in the light most favorable to the plaintiff. *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). We review the Claims Court's evidentiary rulings for abuse of discretion. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

## I. Standing

For the plaintiffs to have standing, they must show that they have suffered an injury in fact, which is an invasion of a legally protected interest. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In the context of the breach of trust claims, the plaintiffs must show the existence of a trust relationship with the government. We find that, under the 1906 Act, such a trust relationship exists and plaintiffs have standing.

The Claims Court noted that the *Osage Tribe* litigation previously before that court had decided the key underlying issues and it was inclined to follow that precedent.

*Claims Court Decision*, 151 Fed. Cl. at 497. Therefore, the court repeated, the "responsibility of the government is to the tribal trust fund account" with the "tribal trust fund then responsible for the ultimate distribution to the individual headright owners." *Id.* (cleaned up) (quoting *Osage 2003*, 57 Fed. Cl. at 395). It concluded that the "plaintiffs' claims regarding trust fund mismanagement are not appropriately asserted against the government because the government's responsibility to correctly distribute and manage funds is a fiduciary duty owed to the tribe—not individual tribal members." *Id.* The Claims Court briefly addressed the Tenth Circuit's decision regarding the fiduciary relationship between the government and headright holders, noting that it viewed the decision as nonbinding and interpreting it narrowly. *Id.* (stating it would "not now judicially create additional fiduciary duties on the government beyond the contours of the specific accounting articulated by the Tenth Circuit and the Northern District of Oklahoma"). The Claims Court did not conduct its own statutory analysis vis-à-vis the trust duties owed specifically to individual headright owners.

We are of the same view as the Tenth Circuit that the text of the 1906 Act plainly indicates that individual headright owners have a trust relationship with the United States. Although Section 3 establishes that the mineral estate is reserved to the tribe and the preamble of Section 4 describes the trust fund as belonging to the tribe, the subsections of Section 4 explicitly provide that the royalties from the mineral estate are to be placed in the trust account "to the credit of the members" and "distributed to the individual members" in the same manner as "other moneys held in trust" in the account. 34 Stat. at 544. Like the Tenth Circuit, we observe that the statute specifies that the funds are placed "to the credit of the members" "on a basis of a pro rata division among the members of said tribe" and provides for "said credit to draw interest" to be

"paid quarterly to the members." *Id.*[3]; *Fletcher 2013*, 730 F.3d at 1209–10.

We reject the government's interpretation that the statute and the Tenth Circuit's analysis mean that headright owners have only a narrow interest in the actual distribution of headright payments. Appellee's Br. 47–52. The government argues that activities occurring in the fund prior to distribution (such as interest generation, payment of gross production taxes, and allocation of tribal operation expenses) are not related to distribution itself and to the headright owners' right to their respective distribution. We agree with the plaintiffs that the government's obligation to them cannot begin and end essentially when the check is cut. Such a narrow interpretation would significantly curtail protection for headright owners and contradict the nature of the trust relationship described in the 1906 Act. As the Tenth Circuit noted, and as common sense dictates, the improper handling of the funds while still in the tribal account can "improperly diminish[] their pro rata share." *Fletcher 2013*, 730 F.3d at 1215. The headright owners' right to a proper distribution cannot be isolated from the proper management of the funds.

However, we are not fully persuaded by the plaintiffs' position either. The plaintiffs appear to advance a theory of a hardline division in rights, whereby the tribe's interest is limited to the mineral estate and the leasing of it while the individual headright owners exclusively hold the right to the funds. Appellants' Br. 20–27 ("[U]ltimately, the Osage Nation has the mineral estate (and the United States owes specific trust responsibilities to the Nation for management of this trust resource) and the individual headright holders have the royalties resulting from

---

[3]    Because we reach the same conclusion as the Tenth Circuit, we find it unnecessary to address the plaintiffs' issue preclusion argument. *See* Appellants' Br. 27–31.

development of the mineral estate. The United States owes specific trust responsibilities to the headright holders regarding royalty management that it simply does not owe to the Tribe."); *see also* Appellants' Reply Br. 16–17. Contrary to the plaintiffs' characterization, while the *Osage Tribe* litigation involved issues that could be characterized as tied to the mineral estate (the failure to collect the highest posted price in royalties from leases), it also involved issues that could be characterized as relating to the trust fund (the loss of interest due to a lag in the deposit of funds and investment underperformance of the funds). Appellants' Br. 21 n.3; *see also generally Osage 2006*, 72 Fed. Cl. 629. And, although we agree that headright owners have a trust interest in the trust fund, the statute also gives the tribe an interest in the fund. 1906 Act § 4, 34 Stat. at 544 ("That *all funds belonging to the Osage tribe*, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . ." (emphasis added)); *id.* ("That *all the funds of the Osage tribe* of Indians, and all the moneys now due or that may hereafter be found to be due to the said Osage tribe of Indians, . . . shall be . . . placed to the credit of the individual members . . . ." (emphasis added)); *id.* ("That the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage tribe of Indians *as other moneys of said tribe* are to be deposited . . . ." (emphasis added)); *see also Fletcher 2013*, 730 F.3d at 1209 ("A small slice of royalty income may be diverted to tribal operations . . . .").

The question of the division of interests is prompted partially by the fact that the prior *Osage Tribe* litigation has already resulted in a significant payment of money by the government to the tribe. That money, plaintiffs' counsel has represented, was distributed to the headright holders, including plaintiff Fletcher. Thus, there are concerns about double recovery if individual headright owners and

the tribe are entitled to assert overlapping (or the same) interests in separate litigations. In addition, whether the broad waiver provision in the *Osage Tribe* settlement agreement between the tribe and the government is binding on the individual plaintiffs and precludes litigation of some or all of their present claims may depend on what claims "could have been asserted by the Osage Tribe." J.A. 130. As an aside, in terms of the settlement agreement's effect, other factors will need to be examined, including whether the tribe had the authority to settle and waive the plaintiffs' claims on their behalf. But, in any case, the issue is not properly before us on this appeal, as the Claims Court did not construe and apply the settlement agreement to the plaintiffs' claims. Appellants' Br. 43; Appellee's Br. 56–57.

Our holding today that a trust relationship exists between the individual headright owners and the government and that "the 1906 Act imposes an obligation on the federal government to distribute funds to individual headright owners in a timely (quarterly) and proper (pro rata, with interest) manner," *Fletcher 2013*, 730 F.3d at 1209, is sufficient to resolve the questions presented in this appeal on standing, as well as jurisdiction under the Tucker Act, discussed below. We do not think the present appeal requires precisely defining the respective boundaries of the trust interests of the tribe and the individual headright owners. Therefore, we decline to do so.

## II. Subject Matter Jurisdiction

The Tucker Act confers jurisdiction on the Claims Court over claims against the United States for money damages. 28 U.S.C. § 1491(a)(1). The Indian Tucker Act provides that the Claims Court has jurisdiction over such claims against the United States by "any tribe, band, or other identifiable group of American Indians." 28 U.S.C. § 1505. During oral argument, plaintiffs' counsel stated there was no need to reach the question of Indian Tucker

Act jurisdiction if the court found Tucker Act jurisdiction, although procedural advantages might come with proceeding under the Indian Tucker Act. Oral Arg. 1:38–3:28, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-1625_12102021.mp3. Because we do so find, we do not address Indian Tucker Act jurisdiction and who constitutes an "identifiable group of Indians."

The Tucker Act does not create substantive rights. It is a jurisdictional provision that operates to waive sovereign immunity for claims premised on other sources of law, such as a statute. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (*Navajo II*); 28 U.S.C. § 1491(a)(1) (including "upon the Constitution, or any Act of Congress or any regulation of an executive department"). However, not every claim invoking a federal statute or regulation is cognizable under the Tucker Act. *United States v. Mitchell*, 463 U.S. 206, 216 (1983). "The claim must be one for money damages against the United States," and "the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Id.* at 216–17 (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

In the context of breach of duties to American Indians, a two-part test is used. The plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo II*, 556 U.S. at 290 (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (*Navajo I*)). A "statute or regulation that recites a general trust relationship" between the government and the Indian plaintiff is not enough. *Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *Hopi Tribe*, 782 F.3d at 667). There must be specific statutes, regulations, or other sources of law that "establish the fiduciary relationship and define the contours of the government's fiduciary responsibilities."

*Id.* (cleaned up) (quoting *Shoshone Indian Tribe of Wind River Reservation v. United States*, 672 F.3d 1021, 1039–40 (Fed. Cir. 2012)); *see also Mitchell*, 463 U.S. at 224–28.

"If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes.'" *Navajo II*, 556 U.S. at 290–91 (cleaned up) (quoting *Navajo I*, 537 U.S. at 506). Principles of trust law are relevant "in drawing the inference that Congress intended damages to remedy a breach." *Id.* at 291 (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 477 (2003)). The Supreme Court has "consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *Mitchell*, 463 U.S. at 226 ("Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.").

As discussed in relation to standing, the 1906 Act establishes a fiduciary relationship that imposes an obligation on the federal government to distribute funds to individual headright owners in a timely (quarterly) and proper (pro rata, with interest) manner. This is not a general trust relationship, but one with specific responsibilities relating to a trust fund that is entirely controlled by the government. It naturally follows that a breach of those responsibilities should be remedied by money damages. Therefore, allegations of mismanagement that reduced the amount in the trust fund ultimately disbursed to headright owners, such as a failure to collect required interest or the improper overpayment of taxes, sufficiently establish jurisdiction under the Tucker Act. Because the Claims Court did not recognize that the 1906 Act establishes a trust relationship between the government and the headright

owners, it erred in finding that plaintiffs failed to specify a source of substantive law that establishes a money-mandating trust relationship. *Claims Court Decision*, 151 Fed. Cl. at 500–01.

The government's arguments that the plaintiffs failed to state how the trust duties were breached specifically by an alleged undercollection of interest or overpayment of taxes—whether, for example, because of a failure to specify statutory requirements for a specific interest rate or to allege facts comparing actual interest collected and obligated interest—go to the sufficiency of the complaint, not jurisdiction. The Claims Court did not address the sufficiency of the pleading and, therefore, the issue is not properly before us in this appeal. The issue, however, is reserved for the government to raise on remand.

### III. Accounting Claim and Damages

The Claims Court also granted the government's motion to dismiss what it characterized as plaintiffs' claim for "a more expansive accounting" based on issue preclusion. J.A. 98; *Claims Court Decision*, 151 Fed. Cl. at 501–04. The Claims Court explained that the Northern District of Oklahoma court determined the time period and scope of the accounting obligations for these plaintiffs, and the Tenth Circuit affirmed. *Id.* at 502–03; *see also id.* at 504 ("[P]laintiffs do not contest that they are the same plaintiffs as those in the Tenth Circuit *Fletcher* litigation."). Therefore, the Claims Court found that issue preclusion applies because the claims for an expanded accounting were identical to those decided and affirmed in the *Fletcher* litigation. *Id.* at 503.

The plaintiffs distinguish their request in the current litigation as one for full damages rather than an expanded version of the accounting they received in the *Fletcher* litigation. *See* Appellants' Br. 47. In the plaintiffs' view, they received the accounting they were owed as beneficiaries of the fiduciary obligations of the government. *See id.* But,

having purportedly identified breaches that mandate damages, based on that accounting, the plaintiffs argue they are entitled to discovery on damages to determine the full quantum owed. *See* Appellants' Br. 47–48. The government, on the other hand, appears to think the scope of the accounting, that was the remedy in the *Fletcher* litigation, should limit the scope of the damages remedy sought in this case. *See* Appellee's Br. 56.

But the harm and purpose that the two remedies are meant to address are different. Accountings owed by a trustee to a beneficiary are meant to "give some sense of where money has come from and gone to" as "an assurance" that trust funds are being handled properly. *Fletcher 2013*, 730 F.3d at 1212, 1215. In other words, the right to an accounting is to aid a beneficiary's oversight of a trustee's actions so that the beneficiary has the information that is "reasonably necessary to enable them to enforce their rights under the trust." *Id.* at 1215 (cleaned up) (quoting Restatement (Second) of Trusts § 173 cmt. c). The Tenth Circuit noted the limited nature of what an accounting was meant to achieve. "Put simply, a duty to account is a duty to account, not a duty to respond to and disprove any and all potential breaches of fiduciary duty a beneficiary might wish to pursue once the accounting information is in hand." *Id.*; *see id.* at 1214–15 (balancing the plaintiffs' need for information with the considerations of practicality and cost on the government). Therefore, although the accounting may reveal alleged failures by the government in fulfilling its fiduciary obligations, the accounting does not necessarily reflect or itemize the full extent of damages.

In contrast, the purpose of monetary damages is to account for the extent of the harm suffered and make an injured party whole. Hence, we see no reason to automatically constrain the scope of an accounting for damages based on the scope of the accounting that was ordered as part of a trustee's duty to the plaintiffs. The period and specificity of the limited accounting granted by the district

court does not necessarily correspond to the full period of damages the plaintiffs might be entitled to nor provide all of the details needed to thoroughly account for the damages. Assuming the plaintiffs' allegations bear out, based on the accounting evidence they have obtained, such that the plaintiffs meet their "burden of proving specifically how the defendant and its agents have failed in their duty to plaintiffs," a further accounting may be required of the government "for the purpose of enabling the court to determine the amount which plaintiffs are entitled to recover." *Klamath & Modoc Tribes & Yahooskin Band of Snake Indians v. United States*, 174 Ct. Cl. 483, 490–92 (1966) (noting also that discovery under the rules of the court is available to plaintiffs in presenting their case as to liability).

That does not mean there are no limits to the information the plaintiffs could get as part of a damages accounting. Statutes of limitations,[4] waiver, forfeiture, preclusion, and other equitable considerations may limit the scope of the plaintiffs' recovery and the information the plaintiffs should receive. It is not possible nor appropriate for us to determine, at this juncture on the case before us, the proper limits if any on damages and thereby on the associated accounting.

---

[4]   *See* 28 U.S.C. § 2501 (six-year statute of limitations); Consolidated Appropriations Act, 2014, Pub. No. 113-76, 128 Stat. 5, 305–06 (2014) ("[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected Indian tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss[.]"); *Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 198–99 (2020) (citing *Shoshone Indian Tribe*, 364 F.3d at 1346–47); *see also* J.A. 21.

#### IV. The Stricken Declarations

Mr. Gray, former Principal Chief of the tribe, and Mr. Pipestem, former lead counsel for the *Osage Tribe* litigation, provided declarations that plaintiffs submitted with their response to the government's motion to dismiss, to support the argument that the settlement agreement between the tribe and the government did not affect the plaintiffs' claims. *Claims Court Decision*, 151 Fed. Cl. at 494. The Claims Court struck these declarations based on the "No Cooperation" provision of the settlement agreement, which states that the tribe and its officers and employees "shall not aid, assist, or support in any way any individual or party in the development, initiation, or litigation of a claim against the United States *that the Osage Tribe has otherwise waived in this Agreement.*" *Id.* at 494–95 (emphasis added) (quoting J.A. 144–145). The Claims Court did not analyze whether the headright owners' claims in this litigation are ones that the tribe had the power to waive in their agreement with the government. Therefore, the Claims Court did not properly determine whether the "No Cooperation" provision applies. We vacate the striking of the declarations.

Because the Claims Court did not apply the settlement agreement in dismissing the complaint, we need not decide the question of whether the declarations can be considered. We note, however, there may be a circularity problem with declarations like these—when they are being used to prove that the settlement agreement does not apply to the present claims, but whether the declarations can be relied on depends on whether the settlement agreement applies to the present claims.

#### CONCLUSION

For the foregoing reasons, we reverse on the issues of standing and Tucker Act jurisdiction, vacate on the issues of the availability of a damages accounting and the striking

of declarations, and remand for further proceedings consistent with this opinion.

**REVERSED, VACATED, AND REMANDED**

Costs

Costs to the plaintiffs.