NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**MONTI PAVATEA GILHAM,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1507

---

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00728-RAH, Judge Richard A. Hertling.

---

Decided: September 8, 2023

---

JUDD JENSEN, Browning, Kaleczyc, Berry, & Hoven PC, Bozeman, MT, for plaintiff-appellant.

DINA BERNICK MISHRA, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by TODD KIM.

---

Before DYK, HUGHES, and STOLL, *Circuit Judges*.

PER CURIAM.

Monti Pavatea Gilham appeals a decision of the Court of Federal Claims ("Claims Court"). The Claims Court dismissed Ms. Gilham's complaint for lack of subject matter jurisdiction. We *affirm*.

BACKGROUND

The following facts are primarily taken from the complaint filed by Ms. Gilham in this action. Ms. Gilham is a citizen of Montana and an enrolled member of the Blackfeet Tribe. Upon her father's death, Ms. Gilham took over upkeep of the family's farming and ranching operations on tribal land within the Blackfeet Indian Reservation. In 2007, Ms. Gilham signed two contracts enrolling two parcels of land in the Department of Agriculture's Farm Service Agency ("FSA") Conservation Reserve Program ("CRP").

The CRP is a program that seeks to "conserve and improve the soil, water, and wildlife resources" of land enrolled in the program. 16 U.S.C. § 3831(a). The program is administered by the Commodity Credit Corporation and the FSA (both agencies of the federal government). 7 C.F.R. § 1410.1. Under the program, "eligible producers"[1] may enter into contracts with the Commodity Credit Corporation whereby the producer agrees to implement a conservation plan in return for payments to the producer. *Id.* §§ 1410.3(a); 1410.20; 1410.40. The regulations separately define a "participant" as "one who participates in, or

---

[1] A "producer" is "an owner, operator, landlord, tenant, or sharecropper, who shares in the risk of producing a crop and who is entitled to share in the crop available for marketing from the farm, or would have shared had the crop been produced." 7 C.F.R. § 718.2. It is unclear from the record how Ms. Gilham qualifies as a "eligible producer"—whether as an "operator" or "tenant" for instance—but no party contests her status as an eligible producer.

receives payments or benefits in accordance with" the program. *Id.* § 718.2. The participant has obligations under the regulations, such as complying with the terms and conditions of the contract. *Id.* § 1410.20. If a CRP contract is terminated prematurely, the participant must repay all payments made under the contract with interest. *Id.* § 1410.32(e)(2). "[I]f the participant has a share of the annual rental payment greater than zero" the participant is jointly and severally liable for compliance with the contract and the regulations. *Id.* § 1410.20(a)(9).

The contracts at issue here were for the period between October 1, 2007, and September 30, 2017.[2] Representatives of the Bureau of Indian Affairs ("BIA") co-signed the contracts on behalf of the United States as trustee of Blackfeet tribal land. Ms. Gilham signed with a 100% share of the contract proceeds, while the BIA representatives signed with a 0% share. Under the agreements, Ms. Gilham agreed "[t]o control . . . all weeds, insects, pests and other undesirable species." J.A. 59. The agreements also provided that "[p]articipants that sign the [agreement] with zero percent interest in the annual rental payment shall not be held responsible for contract performance." J.A. 63.

Around 2015, Ms. Gilham fled an abusive relationship, leaving the farm and enrolling in school in Missoula, Montana. She did not update her address with the FSA. During 2015, the FSA tried to contact Ms. Gilham at the farm address regarding maintenance that needed to be done under the contracts. According to the complaint, Ms. Gilham "did eventually receive an email . . . stating she needed to take care of this maintenance and that it was time sensitive. However, between being trapped in a physically abusive relationship and the emotional trauma of her attacks;

---

[2]    For reasons not clear from the complaint, Ms. Gilham signed two contracts in 2015 enrolling the same tracts of land in the CRP for the same time period.

she couldn't possibly react or respond." J.A. 23. Ms. Gilham admits that her "serious and traumatic life altering events prevented her from properly addressing the maintenance on her CRP acres at issue and the maintenance was not completed timely." J.A. 23. The FSA terminated the contracts in November 2015. On October 20, 2015, Ms. Gilham was sent a letter notifying her of the pending termination.

In 2021, Ms. Gilham requested equitable relief to allow her to retain the payments made to her under the contract from the Department of Agricultures' National Appeals Division based on "the impact of domestic violence and the resulting depression which resulted in losing her CRP contracts." J.A. 23. Ms. Gilham was apparently awarded all the equitable relief she requested, including that she was not required to repay the CRP funds she had received before contract termination.

In June 2022, Ms. Gilham filed a complaint in the Claims Court pleading two causes of action. First, Ms. Gilham alleged that the United States violated its duties under the Administrative Procedure Act ("APA") by (1) "fail[ing] to carry out its basic contractual duties under the CRP contracts . . . such as routine weed maintenance" which "resulted in the early termination of Ms. Gilham's CRP contract," J.A. 25, and by (2) "fail[ing] . . . to provide [Ms. Gilham with] reasonable assistance to obtain equitable relief after the contracts were terminated," J.A. 25–26. Second, Ms. Gilham alleged that the United States violated its trust duties by failing to provide maintenance under the contract. Ms. Gilham did not assert a breach of contract claim. Ms. Gilham requested a declaration that the United States failed to carry out its trustee duties, damages for "those years of the CRP contract that she was never paid following the early termination of those contracts," attorney's fees and costs, and any other just and proper relief. J.A. 27.

The government moved to dismiss Ms. Gilham's complaint for lack of subject matter jurisdiction.  The Claims Court granted the government's motion, holding that "[t]he claims, as pleaded, do not rely on a money-mandating statute or regulation," J.A. 3, and that part of the APA claim and the entire breach of trust claim was also untimely.[3]  Ms. Gilham appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review dismissals for lack of subject matter jurisdiction de novo.  *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1284 (Fed. Cir. 2022).

Ms. Gilham argues that the Claims Court had jurisdiction under the Tucker Act and erred by failing to apply the trust doctrine to the claims in her complaint, apparently arguing that the statute and the CRP regulations are money-mandating and that the Claims Court accordingly had jurisdiction.[4]

Tucker Act jurisdiction "[i]n the context of breach of duties to American Indians" employs a two-part test. *Fletcher v. United States*, 26 F.4th 1314, 1324 (Fed. Cir. 2022).  First, a plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.* (quoting *United States v. Navajo Nation*,

---

[3]    On appeal, the parties dispute whether the statute of limitations bars part of Ms. Gilham's claims.  We do not reach this issue because there is another jurisdictional ground for dismissal.

[4]    On appeal, Ms. Gilham does not appear to be challenging the Claims Court's disposition of her APA claim.  Even if she were, the Claims Court correctly dismissed those claims.  The Claims Court does not have jurisdiction over claims premised only on violations of the APA. *Martinez v. United States*, 333 F.3d 1295, 1311 (Fed. Cir. 2003).

556 U.S. 287, 290 (2009)).  At this step, "[t]here must be specific statutes, regulations, or other sources of law that establish the fiduciary relationship and define the contours of the government's fiduciary responsibilities."  *Id.* at 1325 (internal quotation marks and citations omitted).  If the plaintiff shows such a duty, "[t]he court must then determine whether the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes."  *Id.* (internal quotation marks and citation omitted).  We conclude that Ms. Gilham has failed to "identify a substantive source of law that establishes specific fiduciary or other duties."  *Id.* at 1324 (citation omitted).

Section 3831 of Title 16 of the U.S. Code establishes the CRP and was originally enacted as part of the Food Security Act of 1985, Pub. L. No. 99-198, § 1231, 99 Stat. 1354, 1509.  In its current form, the statute provides that "the Secretary shall formulate and carry out a conservation reserve program under which land is enrolled through the use of contracts to assist owners and operators of land . . . to conserve and improve the soil, water, and wildlife resources of such land and to address issues raised by State, regional, and national conservation initiatives."  16 U.S.C. § 3831(a).  The statute describes various aspects of the program, such as what land is eligible, the maximum acreage the Secretary may enroll at any given time, and minimum and maximum durations of contracts.  The statute does not mention Indian tribes or tribal land.

Part 1410 of Title 7 of the Code of Federal Regulations implements the CRP.  The regulations have some special provisions regarding Indian Tribes, *see*, *e.g.*, 7 C.F.R. §§ 1410.2, 1410.62(f), though those provisions do not appear to be applicable here.  In particular, the regulations provide for a "Transition Incentive Program" that provides incentives for "selling or leasing land to a . . . socially disadvantaged farmer," *id.* § 1410.64(e), including "American Indians."  *Id.* § 1410.2.  No party contends that the

Transition Incentive Program is relevant to this case. The regulations also allow the Commodity Credit Corporation to authorize incentives to "foster opportunities for Indian Tribes." *Id.* § 1410.62(f). No party has cited this provision either. The only regulation Ms. Gilham explicitly cites on appeal is 7 C.F.R. § 1410.32, which requires that the contract be signed by "[t]he owners of the land," *id.* § 1410.32(d)(2), in this case, the BIA as the representative of the United States.

We find that the statute and regulations do not create a trust relationship.[5] First, the statute does not mention "trust." "While it is true that a statute need not contain the word 'trust' in order to create a trust relationship, the failure to use that term gives rise to doubt that a trust relationship was intended." *Wolfchild v. United States*, 559 F.3d 1228, 1238 (Fed. Cir. 2009). Ms. Gilham also points to no indication in the statute itself nor the legislative history that Congress intended to create a trust relationship. There is similarly nothing in the regulations purporting to create a trust relationship.

Second, the statute is a generally applicable statute not specific to Indian tribes. The intent of the legislation was to "discourage new cultivation of fragile lands that are unsuitable for intensive agricultural production without the application of proper conservation practices." S. Rep. No. 98-296, at 2 (1983), not to protect Indian tribes. "[U]nless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, [courts] will not apply common-law trust principles to infer duties not found in the text of a treaty, statute, or regulation." *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1814 (2023) (internal quotation marks and citation omitted). Nothing in the statute establishes a trust relationship with Indian tribes.

---

[5] We do not decide whether a regulation could in and of itself create a trust relationship.

Third, it is particularly clear that there is no trust relationship in this situation because there was no obligation placed on the government by the statute or regulation similar to that claimed by Ms. Gilham. There are no relevant "specific rights-creating or duty-imposing statutory or regulatory prescriptions." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). The regulations contemplate that participants with "a share of the annual rental payment greater than zero" are responsible "for compliance with the provisions of such CRP contract and the provisions of this part." 7 C.F.R. § 1410.20(a)(9). In this case, the BIA signed with a 0% share, and was not obligated by regulation to perform on the contract. Nor is there anything in the statute or regulations that would obligate the government "to assist [Ms. Gilham] in obtaining reasonable relief under the CRP contracts." Appellant's Br. 18.[6]

We have considered Ms. Gilham's other arguments and find them unpersuasive.

**AFFIRMED**

COSTS

No costs.

---

[6] To the extent that Ms. Gilham is arguing that a contract in itself could create the requisite trust relationship—a question we do not decide—these contracts clearly did not do so. The BIA signed the contracts as a 0% share participant. The contracts specifically provided that "[p]articipants that sign the [contract] with zero percent interest in the annual rental payment shall not be held responsible for contract compliance." J.A. 63.